May it please the Court, Davina Chen on behalf of Susan Rodriguez, I'm going to try to reserve five minutes for rebuttal. The jury question as to Susie Rodriguez was whether the government proved beyond a reasonable doubt that she was not, as the defense contended, merely enmeshed in a variety of intense, long-standing, but ultimately personal relationships with men who were gang members, but rather that she was conspiring with these gang members to participate in the conduct of the affairs of a racketeering enterprise and conspiring to commit murder to maintain or increase her position in that enterprise. To prove its case against Ms. Rodriguez, the government relied primarily on the testimony of a cooperator, Glenn Navarro, and it attempted to corroborate the testimony of that cooperator with selections of recordings that were curated and interpreted by its investigators. Unless the Court would prefer that I start elsewhere, I plan to focus today on the two issues about the recordings. First, the unusual mid-trial explanation that the defense was free to request additional portions of recordings be played, which the Court gave in direct response to the defense theory that the government was presenting only the recordings that supported its theory and that there were many other recordings that the jury would never hear that did not support its theory. And second, the interpretation of those recordings by officers who provided days of intermingled lay and expert opinion testimony, much of which was inadmissible, and all of which was received under the guise of expertise. Each of these errors, standing alone, requires reversal. Turning first to the instruction about the government's selection of recordings, defense counsel received 200,000 recordings in discovery. The government introduced 61, 17 of which involved Ms. Rodriguez, and they introduced them mostly through their case agent, Officer Gonzalo Gallardo. After he spent days presenting the testimony and interpreting these recordings, on cross-examination, the Friday before Thanksgiving, defense counsel elicited from Mr. Gallardo how you selected the recordings. And Gallardo explained that the process was overwhelming, that anyone who was available just grabbed whatever they could listen to. No logs were kept. No notes were kept. They were just trying to pick out the best calls of evidence. That was the Friday before Thanksgiving. On the Monday before Thanksgiving, the government moved for a curative instruction, because they said that counsel had improperly suggested that Officer Gallardo, and perhaps other members of the Santa Ana Gang Task Force, got to decide what evidence was presented during trial to the jury. The next day, on redirect examination, the government elicited from Gallardo that he had not concealed any of his role to determine what evidence was relevant. But on recross, he explained that although the officers gave all the recordings to the government, they only identified those recordings that were consistent with their theory of the case. Those recordings that supported their theory, and they ignored the rest of the recordings. And he also testified that he didn't believe that the government listened to any of the recordings except for the ones that the Task Force officer identified. The court then broke for Thanksgiving recess. And when the jury came back, and over defense objections, the court gave an unusual mid-trial instruction, referencing the testimony before Thanksgiving about how the recordings were selected, and explaining that the defendant was free to request the court to play additional recordings, if necessary, to place the government recordings in context. The court repeated this instruction at the end of trial, when the defendant refused to promise to refrain from arguing that the government selectively chose the recordings that should be played. This was reversible error. A primary defense at trial was that the government had cherry-picked the recordings in a biased investigation, and that if the jury had to listen to all 200,000 recordings, a different picture would emerge. This instruction undercut that defense. It placed the court's imprimatur on the government's theory by suggesting either that the defense was dilatory in failing to request that recordings be played, or that worse, the court had already determined that the selection was fair. And it shifted the burden of proof by suggesting to the jury that the defendant had some obligation to put on recordings, which was particularly pernicious in a case where the defendant was, in fact, prohibited from putting on recordings. Had this been mentioned in the government's argument, because it's not uncommon for these sort of defenses to be mounted and for the prosecution to say in closing argument that, look, to the extent that, you know, the government always carries the burden of proof, but to the extent that defense thought that there was a recording that would be helpful, the defense could have made that request to the court. So had it come up in the government's instruction, would that have been problematic? That would have been problematic as well, because as we know, all of these instructions, all of these recordings came in as co-conspirator statements, which is an exception to the hearsay rule. The fact is, the defense is not permitted to put in these kind of recordings. So if the government had made the statement in argument, it would have been a misstatement of the law. Well, what about under the rule of completeness? Is there anything that prevents the defense counsel from saying, wait a minute, that selection was really particularly unfair because you have to play the next sentence, for example, or the next portion of the conversation in order to put it in the appropriate context? I mean, nothing prevents the defense from doing that. Nothing prevents the defense from requesting it. But in this case, each time that the defense requested it, it was overruled. And this Court has a very narrow reading of the rule of completeness. I literally gave you the case with the same district court judge and the same trial attorneys, where the statement that came in was, I drove the boat, and it was an alien smuggling case. And the full statement was, I drove the boat while the captain was peeing and trying to fix the engine. And this Court affirms saying, I drove the boat is the defendant's statement. The rest is not misleading, and therefore, the district court did not abuse its discretion. But really, it's sort of off the point, because we're not talking about the rule of completeness. We're talking about the selection of recordings in a biased investigation. There were 200,000 recordings. There was no rule of completeness rule that would have permitted the defense to put in any of the recordings that were not part of the recordings that the government had already put in. And so the point that the defense was trying to make, and it became very clear at the — before the instruction was given again, when Judge Selma said, well, are you going to argue that they've selectively, you know, impliedly, unfairly put in evidence, the defendant said, we are going to argue that the government selected the most inculpatory recordings and did not put on the exculpatory recordings and that we are prohibited by the hearsay rule to put in the exculpatory recordings. And after he said that, Judge Selma said, okay, overruled, I'm giving the instruction. So I think that if the government had made the argument, it would have been problematic as a misstatement of the law. The fact that the court made the argument made it sound like this was the law, that somehow if the defendant had wanted to put on any kind of recordings, she could have put on recordings. But it's against the rules of evidence. She was not permitted to put on recordings. Does the court have any more questions about that issue? Because if not, I would turn to the second issue, which is the dual role testimony. In this case presents the perfect storm of dual role testimony, because the government presented days of intermingled lay and expert opinion testimony, much of which was inadmissible as either, and all of which was admitted under the guise of expertise. The problems of this case illustrate why several circuits prohibit law enforcement agents from interpreting recordings based on evidence not before the jury. But even under VERA, the law of this court, reversal is required. There can be no mistake. The district judge admitted the officers' interpretations of the recording wholesale as expert opinion testimony. He gave the defendant a running objection for any time the witness interprets what is being said on the transcripts. And when the defendant asked, what is the basis for admitting the interpretations, the court answered, it's opinion testimony. So any time he's interpreting what the words mean, you will have a standing objection to hearsay and not a proper opinion testimony. And then the court later explained that whenever gang experts testified to their understanding or opinion of meetings of calls, that was appropriate expert testimony under Hanke. It was just as clear that it was communicated to the jury that these interpretations were based on the witness's education, training, and experience. That is, that they were based on specialized knowledge. The court's explanation that the interpretations were being admitted wholesale as opinion testimony was made before the jury. And the court instructed the jury repeatedly at ER 55, 73, 74 and 75, 77, 103, and 105, that when witnesses are permitted to give opinions, this was because the court had found that they had the requisite education, training, and experience to give opinions. Thus, even if all of the interpretations were admissible as either expert or lay opinion testimony, and they were not admissible, but even if they were, this Court must still revert, because the Court's instruction guaranteed that the jury received the testimony as expert testimony. Right. I read the instruction. It did not make a distinction among recipient testimony, lay opinion testimony, and expert opinion testimony. Exactly. He talked about opinion testimony putting together, I mean, lumping lay opinion and expert opinion together. So are you arguing that that gave Gallardo extra expertise in the lay opinion category? Yes. I'm arguing that because the court explained repeatedly that opinion meant based on scientific, based on his education, experience, and knowledge. And so opinion in this case became code word for expert testimony. In fact, that's what they asked for. Everyone said, well, expert gives them even extra, extra credibility, so let's just, instead of say expert, we'll say opinion testimony is based on education, experience, and knowledge. All right. Was that objection made to the district court? Which objection? The dual testimony instruction. That objection was not made to the district court. The objection that was made to the district court is that lay opinion testimony should be considered lay opinion testimony, and expert opinion testimony should be considered expert opinion testimony. And the district court admitted everything as expert opinion testimony. So that objection was made. Yes. I'm trying to understand whether we're playing our review on this issue. The objection was made. In fact, at some point, the government offered to say, well, when we're talking about expert opinion, should we say, you know, based on your knowledge, experience, et cetera? And the court said, yeah, you should do that. And then the government said, well, maybe we should do that for lay opinion also, because lay opinion is also based on X, Y, and Z. And the court said, no, it's not based on X, Y, Z. Lay opinion is like how fast was the car going. So there was quite a bit of discussion as to what was lay opinion and expert opinion. And when all the testimony kept coming in, there were multiple objections from the defense that this is not proper expert opinion testimony. And they were all repeatedly overruled. And the court finally said, it's becoming abusive and obstructive. Stop objecting. It's all coming in as expert testimony. So the defense was very clear that it didn't think any of this was expert testimony. And the court overruled all those objections. So the issue at appeal is not so much that the jury instruction didn't distinguish between lay opinion and expert opinion, which would have been better, of course. And now I noted that the Ninth Circuit commentary specifically recommends that. The issue on appeal is that all of it was admitted as expert opinion testimony. So even if the instruction had said there's percipient, there's lay opinion, and there's expert opinion, on the facts of this case, everything that should have come in as lay opinion testimony was labeled expert opinion testimony by the court. And again, those are the sites that I read out earlier. And so what we have here is a case where basically the case agents were allowed to just tell the jury their theory of the case through the recordings. And the jury was instructed that they were permitted to do that because they had the relevant expertise. And under VERA, that's reversible error. I see I have four and a half minutes. All right. Thank you very much. Good morning. Rob Keenan for the United States. I think I will follow Ms. Chan's lead and address those two arguments that she has raised. First, as to the RICO or I'm sorry, as to the mid-trial curative instruction, it was needed to address a misleading suggestion, contrary to fact, made by defense counsel, not Ms. Chan, the trial lawyer, that the government had concealed recordings from the defendants. It was not true. It needed to be fixed. Ultimately, I did do some repair work with the redirect examination, but I believe that a curative instruction was necessary. It was not the one that the court wound up giving. It was the court's instruction was a very limited, in my view, watered down instruction. It certainly did not cause any prejudicial error here. It was a limited advisory. It simply noted that if there were instances where the government played a recording and additional excerpts were needed to make clear context for that recording, the other party could present it. Importantly, the defendant conceded that the mid-trial curative instruction was correct, correct statement of law, when Judge Selna asked. And it's just because I thought there was some suggestion to the contrary. Judge Selna did allow the defendants to introduce excerpts of certain exhibits. I don't know that they took him up on that offer, but that was expressly permitted. And lastly, on the subject of prejudice, Officer Gallardo testified, as Ms. Chan just admitted, that what was presented in court was only a small fraction of what the total number of calls were. And the defendants, in fact, argued that point in their closing arguments. They argued that it was selective, biased, etc. So I don't think there's any error with the instruction, which is correct statement of law, and it's not prejudicial. As to the dual role opinion witnesses, you know, this Court has, in multiple cases, approved opinion testimony of law enforcement officers relating to drug jargon, street gangs, the operations of street gangs, etc., the very type of testimony that was introduced here. And it is done so under both the label of expert testimony, as well as lay opinion testimony. And I think in Vera, or perhaps it's Freeman, the Court has noted that the line between those two is a little bit, it's not well defined, it can be vague at times. And in instances throughout the trial, with Officer Gallardo's direct examination, I, in fact, invoked both his training and experience, but also his knowledge of the investigation as well. So calling at times for lay opinion and expert opinion testimony. And that was an effort to comply with Judge Selna's minute order prior to trial, that we try to make that clear. So it's not accurate that it was presented so that the opinions of Officer Gallardo or Officer Feeney relating to the meaning of certain words and phrases in the telephone calls was, or were, all introduced as expert testimony. We introduced it as lay opinion testimony as well. This case is different from Vera. It's different from Freeman. And I think the other case, the defendant's site on this subject. In Vera, there was no cautionary instruction whatsoever. The Court found there was no adequate foundation whatsoever for the agent's opinions. And more importantly, the reason that one portion of the judgment was reversed, not the convictions, mind you, but the drug quantity findings in the case. The Court was very concerned that essentially the calls being interpreted by the agents didn't provide any plausible basis for those opinions. And the opinion of the Court was that essentially the testimony was entirely speculative and not supported by any plausible reading of the telephone calls that he was reading. Lastly, the Court specifically found that it wasn't harmless error, the testimony there, because it related specifically to a fact that triggered a mandatory minimum. That's not this case. First, we have a very strong cautionary instruction used repeatedly throughout the trial. It's based on the Court's model instruction, and at the defendant's request, actually, the Court wiped away any distinction between the expert testimony we struck at the defendant's request to the word expert, and instead simply cabined it all as opinion testimony. And that was at the defendant's request, and there was no objection to the end result of the Court's modified instruction. The defense didn't object to the fact that it didn't distinguish between lay opinion, for example, and expert opinion. So I do think that issue, it's, excuse me, under plain error review. To the extent instructional error was even raised, and I'm not of the view that it was. But the instruction said don't give undue deference to the expert opinion testimony, excuse me, to the opinion testimony. Shouldn't influence your assessment of the agent's credibility, the mere fact that they were allowed to introduce testimony based on their training and experience, for example. Evaluate them like every other witness. That was the effort to address Vera's concern. Judge Wardlaw, you were on that panel. Vera's concern that, you know, if you have an agent testifying under the rubric of an expert, that it might give undue credibility to them. So this instruction. I was going to say, was this, that case, the Vera case, was that, that was an outgrowth of the same conspiracy that was charged here? I mean, not the same conspiracy with the Vertex. It's part of the same gang membership? Maybe not. I don't believe so. Okay. It was the, it was agents from the same gang task force. Right. Okay. Never mind. And I could be wrong about that, but it's not something I focused on. Okay. But the, so in addition, it addressed the subject, you know, the court, the other concern in this area that the court has expressed is concern about, you know, the expert testimony or lay opinion testimony not be used as a conduit for hearsay. We don't, we have a jury instruction that expressly told them, unless there's fact testimony based on personal knowledge, the, any facts relied upon are not proven. Unless the, again, the witness testifies from personal knowledge about those facts or the facts were established independently by other witnesses. So very strong instruction was read at the beginning of Officer Gallardo's and Officer Feeney's testimony. It was read during the middle of Officer Feeney's testimony, and there were some additional snippets, if you will, of it relating to the hearsay issue that Judge Feeney referred to in pages 555 and 579 of the excerpts of record. It was also read at the end of it. So this is very different from Vera, from Freeman, all of the defense cases where there was no cautionary instruction. Let's go to what I think the main point of it. According to the reply brief, the main objection is a lack of foundation. I disagree with their characterization of the direct examination testimony and the foundation for Officer Gallardo and Officer Feeney. First, I'll just focus here, I think, primarily on Officer Gallardo. He testified during his direct examination that he was one of the lead investigators in the case, that he participated in every aspect of the investigation. As part of that, he listened, he was in the wire room and also during a nine-month wiretap investigation where he listened to, I believe his testimony was hundreds of wiretap intercepts and overheard portions when he was in the room. He reviewed 50 jailhouse recordings relating to this investigation. He personally witnessed, as well as while it was being videotaped, a meeting between Peter Ojeda's faction at the Orange County Jail and the representative of Armando Moreno's faction, Lionel Vega, that's Exhibit 101 and 105, where they discuss the conflict between those two factions and the two M.A. brothers. He reviewed approximately 20 jailhouse cites relating to this case, including ones that weren't introduced through his testimony, but nonetheless he reviewed them. He participated in surveillance operations. He participated in undercover operations where he acted as an undercover agent. So we made crystal clear that he knew backwards and forwards every part of this investigation. He was intimately familiar with all of the investigation and the facts we were presenting. And the phone calls that he interpreted, they were all introduced. The ones that he interpreted, they were all admitted as evidence, I mean to say. And so the jury had a chance to read and listen while he was testifying. And then when we went back to the specific excerpts, they could evaluate his testimony. Does that make sense? Does it ring true? And there were other calls and testimony of other defendant government witnesses, including a cooperating defendant, Glenn Navarro, an insider in the Ojeda faction, who testified consistently with the main points, the main facts that really underlay Officer Gallardo's testimony regarding the interpretation of the calls. Specifically, that there was a dispute between Peter Ojeda's faction and Armando Moreno's faction, that there was a management crew left in Orange County by Peter Ojeda and who those individuals were, and the change in management with Jacob Juanosto being removed at some point and replaced by Don Igular. So the calls that were being interpreted were actually his interpretation, rather, of the calls that we reviewed with him was backed up, supported, corroborated by other evidence, not, as the defense suggests, just by consistent testimony of a cooperating defendant, but by immutable facts that weren't changing, videos, audio recordings of telephone calls, jailhouse kites, all consistent with his testimony. We don't have the Vera problem either with the, if you will, an agent who, as this Court's assessment, was acting as if he could perceive all, right, in the Oracle of Delphi, where he could interpret, you know, what's five pants mean? Oh, that's 40 grams of heroin, for example. It was something cited. I'm not asking you to go through step by step, but there were some interpretations at 49 to 50 in the Blue Brief that seemed a little, much of a stretch, and maybe these were the most egregious, but I did find them a little troubling. Well, I think what I would say is that I don't recall that specific example. For example, when Susie said it makes it sound convincing, she was confirming Moreno as a made Mexican Mafia member, but their awaiting confirmation, he has been disregarded. Yes. I mean, that seems a bit of a stretch there. Yes. Well, I think what happens is, and I'm not faulting Ms. Chen for it, but in these kinds of things, she highlights one example of the testimony. And there's a substantial amount of testimony that precedes it. And so the example I was going to use was there were a number of bullet points in the opening brief, and they all, we sort of, in our answering brief, grouped them as things where Officer Gallardo's testimony was based on his understanding, his representation to the jury that there was a conflict, a feud, as he said, between the two factions, Ojeda's and Moreno's. The very first testimony on that point was regarding Exhibit 92. It can be found at pages 675 and 76. There, another co-defendant, Omar Briseño, referred to, quote, the soap opera with Mondo, unquote. And it was then that Officer Gallardo was asked his understanding as to what that meant. He said it was referring to an ongoing feud between Ojeda and Mondo. There was an objection at the time, lay the foundation. So I asked what the basis for that was, and he said his review of jailhouse kites, multiple, and his review of recorded calls. That's the foundation specified. It's not what he heard from, you know, cooperating defendants or hearsay from other agents, but specific jailhouse kites and recordings. Over the rest of his testimony, in the intervening page, in the next 50 or 60 pages or so, when I was reviewing calls and we would come upon a phrase or a sentence that touched upon that very issue, the existence of the feud, I provided further foundation by linking back to the opinion and said, is this one of the examples that you're talking about, a jailhouse kite or a recording that served as the basis for your previously expressed opinion? He said yes. And there were also a raft of exhibits introduced through him as well as other witnesses, telephone calls, kites that are referring to the conflict, Armando, excuse me, Tommy Rodriguez in the videotaped meeting with Lionel Vega, Exhibit 101. They're talking about the dispute. Vega expresses concern that a lot of guys are getting hurt at the jail as a result of it. We had evidence that one of Ojeda's lieutenants, Joe Lara, had been assaulted at the jail during that same time by another gang member, that sort of thing. So this is not a case where, like Vera, where the testimony is detached from reality to rely on or to interpret basically what Vera said. It has a strong factual foundation, not only with the exhibits that were introduced by Officer Gallardo, but all of the other evidence summarized in our answering brief. Did the jury have transcripts available? They did. Were they admitted? Yes. Well, excuse me, the transcripts were admitted if they had a significant amount of Spanish in them, because then they had to be admitted for that purpose. If they were strictly recordings in English, then we didn't introduce the transcripts. But they did have them in, you know, little books like this one that allowed them to read along. And anyway, so the answer is yes. Lastly, I just wanted to talk about harmless error. If the court were to find that the direct examination of these two witnesses, you know, had any deficiencies regarding foundation, the fact is that there's overwhelming evidence of the defendant's guilt on both the RICO and the Vicar accounts. We did have testimony, as Ms. Chen admits, an insider, part of the OJEDA organization, Glenn Navarro, who testified about day-to-day dealings that he had with her during the course of the conspiracy regarding all of the racketeering activity, the murder conspiracy against the Moreno faction, the murder conspiracy against the gang members up at Wasco State Prison who stabbed and attempted to kill Tyrone Rye up at that prison, the drug trafficking as well, and the collection of taxes and the distribution of the tax money. We have evidence, and not just his testimony on that subject relating to the conspiracy to kill Miklo, the gang member up at Wasco, at her house during an execution of the search warrant. The agents found Tyrone Rye's letter asking for justice and authority to strike back against those individuals. So that corroborated Glenn Navarro's testimony on that. We had testimony from Oscar Moriel, another gang member who had personal dealings with Suzy Rodriguez. We introduced a number of telephone calls through him, jailhouse calls. Since he was on the phone, we asked him to explain what those calls were about rather than Officer Gallardo. But we have ample testimony from that. And, again, a raft of jailhouse calls and kites, including Exhibit, I believe it's 97. That's the one that's quoted in our brief. And we provided a CD with the recording so the court could evaluate the tone of voice and the general demeanor of the defendant, where she's directing Tommy Rodriguez to strike out against the Moreno faction. And after that call, we had evidence of several kites being intercepted at the jail, threats about hard candy, 187, referring to the murder statute, to strike out against the members of the Moreno faction. The convictions in this case are supported by overwhelming evidence, and we believe the sentence is also appropriate, not defective, either procedurally or substantively. And we ask the court to affirm. Thank you. Thank you very much, counsel. I'm not sure where to begin. Is there something in particular that the court would like me to address first? You could respond to the harmless error argument. The error was not harmless in this case. As the government indicated, most of the evidence against Suzy Rodriguez was from Glenn Navarro, and Glenn Navarro was completely unreliable. First of all, he got a time-serve sentence, even though he was a much bigger player in this case. But even his testimony was internally inconsistent. He said that he talked about everything with Suzy Rodriguez, everything, you know, murder, drug trafficking, et cetera. However, the government had wiretaps on both of Glenn Navarro's phones, and for the last six months of the investigation, Glenn Navarro wore a wire specifically to capture these kinds of conversations, and yet there was not one conversation with Glenn Navarro and Suzy Rodriguez discussing any of these things. He said that Suzy Rodriguez was actively involved in extortion, but his own testimony was that he gave tax money to Rosemary Ojeda and Gloria Aguilar, never to Suzy Rodriguez. He testified that Suzy was totally crucial to the entire enterprise because she's the one who visited Peter Ojeda, but she didn't start visiting Peter Ojeda until the spring of 2010, when Beto Vargas was already in Orange County running the Orange County Mexican Mafia. And furthermore, he testified that before Suzy Rodriguez came along, it was Rosemary Ojeda and Gloria Aguilar that did this kind of conduiting with Peter Ojeda, but their own records show that Peter Ojeda never received a visit from Gloria Aguilar or Rosemary Ojeda. So their entire case depends on Glenn Navarro. Now, for things that were found in her house, you have to remember, Eddie Ojeda lived in that house. She was providing end-of-life hospice care to Peter Ojeda's brother, which is what brought her into this case to begin with. This is a 48-year-old woman who had never been accused of any sort of criminal or gang activity before. She's divorcing her husband, Tommy Rodriguez. Eddie Ojeda is dying of colon cancer, and she brings him into her home to give him care for the last six months of his life, and her house becomes sort of like this gang haven. They have meetings while she's at work. The government relies on the fact that there was some kill order that occurred at her house, but the evidence was undisputed that she was at work that day and didn't even know that it occurred. Suzy Rodriguez gave her life for everyone. She would do anything to help anyone. That doesn't make her a racketeer, a conspirator, or any of these things. The government may have been the evidence may have been strong against Peter Ojeda, and that's why they needed 35 days, but there was practically nothing about Suzy Rodriguez. Does the Court have any other questions? Do we have questions? Thank you.
judges: Thomas, Wardlaw, Nguyen